# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CHRISTINE BRADY, | : | Case No.: 2:10-cv-03043 (SDW-SCM) |
| | : | |
| Plaintiff, | : | MDL No. 2158 |
| | : | |
| vs. | : | HON. SUSAN D. WIGENTON, |
| | : | U.S.D.J. |
| ZIMMER, INC., ZIMMER HOLDINGS, INC., | : | |
| and WILSON/PHILLIPS HOLDINGS, INC. | : | |
| a/k/a ZIMMER WILSON PHILLIPS, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' RULE 50(a) MOTION
## FOR JUDGMENT AS A MATTER OF LAW

### I.  JUDGMENT SOUGHT

The defendants, Zimmer, Inc., *et al.* (collectively "Defendants" or "Zimmer"),

respectfully move for judgment as a matter of law on all remaining claims asserted by the

plaintiff, Christine Brady ("Plaintiff"),[1] pursuant to Federal Rule of Civil Procedure 50(a).  All of

Plaintiff's remaining claims are time-barred by a one-year prescription period.  La. Civ. Code art.

§ 3492 (LPLA); La. Civ. Code art. § 2534 (redhibition).  Accordingly, Defendants are entitled to

judgment as a matter of law.

Specifically, there is no legally sufficient evidentiary basis for a reasonable jury to find

that Plaintiff's claims accrued after March 8, 2009.  *See* Fed. R. Civ. P. 50(a)(1).  Indeed,

---

[1]    On April 23, 2015, the Court granted, in part, Zimmer's Motion for Summary Judgment.  (Doc. 706,
incorporating record from April 23, 2015, hearing at 32:13 – 33:11).  Thus, the only remaining claims are for (1)
Louisiana Product Liability Act ("LPLA"), design defect, (2) LPLA, failure to warn, and (3) redhibition.

Plaintiff's unequivocal, un-contradicted testimony is that she had actual (or at the very least

constructive) knowledge of an injury or pain possibly related to her Durom Cup no later than

December 16, 2008:

> Q:     Ma'am, in 2008, you knew that you had pain and an injury as a result of
>        your Durom Cup; true?  Right?
>
> A:     Yes.
>
> * * *
>
> Q:     And, in fact, you knew that it was, in your mind, as a result of a defect in
>        the coating of the Durom Cup.  In 2008, you knew that; right?
>
> A:     I believed that in 2008, yes.

(5/7/15 Tr. at 78:3-12) (emphasis added).

> Q:     And in your mind, in the fall of 2008, you believed there was a defect with the
>        product; true?
>
> A:     Yes.
>
> Q:     And you were having the pain and problems that you were having as a direct
>        result of that defect in the product; right?
>
> A:     I believed that.

(5/7/15 Tr. at 41:24 – 42:4)

Moreover, even though not required to start prescription, Plaintiff understood that she had

a *claim* and that she was in *settlement negotiations* related to the Durom Cup in December 2008:

> Q:     And at that time Dr. Shahrdar also gave you the "Dear Patient" letter from
>        Zimmer; right?
>
> A:     Yes.
>
> Q:     And that was a letter that prompted you to call Zimmer to discuss
>        compensation for your claim; right?
>
> A:     Yes.
>
> Q:     And Dr. Shahrdar urged you to call Zimmer to discuss compensation for
>        your claim; right?

-2-

A:      Yes.

(5/7/15 Tr. at 60:18 – 61:1)

Q:      So you understood [in December 2008] that you were <u>in fact making a claim</u> with Zimmer for compensation related to your loose Durom Cup. True?

A:      <u>I believe that was the case</u>.  I believed that was the purpose of calling right away.  My doctor had instructed me to call right away.  I believed at that time that Zimmer would pay for the second surgery before I had the surgery.

(5/7/15 Tr. at 50:20 – 51:1) (emphasis added).

Q:      Alright.  And then if we go to December 18, 2008.  As we discussed, you called Zimmer and you discussed potential settlement of your claim with Dona Reust; correct?

A:      I believe so, yes.

(5/7/15 Tr. 61:2-5)

Q:      And those are the settlement negotiations that you began with Ms. Reust on December 18, 2008; right?

A:      Yes.

(5/7/15 Tr. 62:2-4)

If there is any doubt about what Plaintiff knew in December 2008, she summarized her knowledge this way:

Q:      And then on December 16, 2008, you did return to see Dr. Shahrdar, as we discussed.  He again examined you and took more X-rays; right?

A:      Yes.

Q:      And those X-rays showed a radiolucent line all the way around the cup; right?

A:      Yes.

*  *  *

Q:      … And Dr. Shahrdar told you at that time that your Durom cup was defective; right?

-3-

A:     Yes.

Q:     And that there was a defect in the coating of the shell; right?

A:     Yes.

Q:     And that that coating had not been properly tested by Zimmer; right?

A:     Yes.

Q:     And that due to that defective coating, the bone had not grown into the back side of the cup, the shell; right?

A:     Yes.

Q:     And as a result of that, your cup was loose; right?

A:     Yes.

Q:     And as a result of all of that, you were going to have to have a revision surgery?

A:     Yes.

Q:     <u>And at that point in time there was no doubt in your mind that you would need a revision because your implant had failed because it was defective; right?</u>

A:     <u>Yes</u>.

(5/7/15 Tr. at 59:13 – 60:17) (emphasis added).

Plaintiff even confirmed her actual knowledge in response to questions from *her own counsel*:

Q:     Now, the … August, 2008 meeting with your doctor, Dr. Shahrdar, you were having problems; correct?

A:     Yes.

Q:     You believed that the cup was defective?

A:     Yes.

Q:     You were told that the cup most likely was the cause of your problems?

A:     Yes.

-4-

(5/7/15 Tr. at 65:12-19).

Based on this testimony alone (let alone the scores of evidence and argument below), there is simply no legally sufficient evidentiary basis for a reasonable jury to find that Plaintiff's claims accrued after March 8, 2009. Thus, all of Plaintiff's remaining claims asserted in her March 8, 2010, Complaint are time-barred by Louisiana's one-year prescription period. La. Civ. Code art. § 3492 (LPLA); La. Civ. Code art. § 2534 (redhibition). The Court should therefore enter judgment in favor of Defendants and against Plaintiff, and award Defendants their costs and all other appropriate relief.

## II.   FACTS AND EVIDENCE SUPPORTING JUDGMENT

The following facts and evidence support this Court entering judgment in favor of Defendants as a matter of law:

1.     At all relevant times, Plaintiff was a citizen of Louisiana, residing in Homer, Louisiana. (5/6/15 Tr. at 80:7-20).

2.     On August 23, 2006, Plaintiff underwent a right total hip arthroplasty ("THA") performed by Dr. Cambize Shahrdar in Shreveport, Louisiana. (5/7/15 Tr. at 18:2-12; 96:12-17; Jt. Tr. Ex. 4 (implant operative report)).

3.     Dr. Shahrdar implanted a Durom Acetabular Component ("Durom Cup"), (5/7/15 Tr. at 96:20-22), that was designed, manufactured, and put into the stream of commerce by Zimmer. (Pl. Compl. *passim*, at Doc. 1).

4.     Approximately six months after she received her Durom Cup, Plaintiff began experiencing a gradual increase in pain when she changed positions, including a hard pinching in the deep tissues of her groin and buttock area. (5/7/15 Tr. at 18:21 – 19:5; 58:13-24).

ME1 20331020v.1

5.     In January 2008, Dr. Shahrdar believed that there might be a problem with the Durom Cup, and he stopped implanting the Durom Cup in his patients.  (5/7/15 Tr. at 101:11-21).

6.     Between May and August 2008, Dr. Shahrdar had regular communications with Zimmer's marketing, clinical, and research personnel related to his concerns about the Durom Cup.  (5/7/15 Tr. at 102:3 – 103:12; 143:11-21; 145:23 – 146:14; 109:20 – 110:22; 154:16-19).

7.     On July 2, 2008, Dr. Shahrdar wrote a letter to Zimmer CEO, David Dvorak, and Zimmer Chief Scientific Officer, Cheryl Blanchard, asking that Zimmer immediately stop selling the Durom Cup.  (7/5/15 Tr. at 104:16 – 105:24; Jt. Tr. Ex. 22 (7/2/08 letter)).

8.      By July 2008, Dr. Shahrdar "clearly had formulated in [his] mind that [he] thought the Durom Cup was problematic or defective."  (5/7/15 Tr. at 117:5-14).  Specifically, Dr. Shahrdar was confident that a defect in the Durom Cup's coating prevented bone from growing onto the backside of the Cup causing it to loosen and requiring revision.  (5/7/15 Tr. at 111:13 – 112:4).

9.     In early August 2008, three Zimmer personnel – David Royster, Doña Reust, and Erin Johnson – met with Dr. Shahrdar to discuss his experience with the Durom Cup. (5/7/15 Tr. at 105:25 – 106:14; 107:1-8; 108:2-10).

10.     In conjunction with that meeting, Mr. Royster and Ms. Reust provided to Dr. Shahrdar a "Dear Patient Letter" explaining the outcome of Zimmer's voluntary investigation and corrective action related to allegations of a higher than expected revision rate with the Durom Cup experienced by some surgeons in the United States.  (5/7/15 Tr. at 106:15-25; 107:19 – 108:1; Jt. Tr. Ex. 31 (8/13/08 letter)).

11.     The Dear Patient Letter explained, in part:

-6-

ME1 20331020v.1

> Please understand that Zimmer does not fault your doctor, and is taking responsibility for the corrective action.  By giving you this letter, your doctor believes that you may need to have your Durom Cup revised, or replaced. Zimmer would like to discuss with you compensation for any costs that may be associated with any future surgery to replace the cup.

(5/7/15 Tr. at 47:9-21; Jt. Tr. Ex. 31).

12.     Also during this time, Dr. Shahrdar observed that several of his Durom Cup patients were experiencing unexpected pain associated with their Durom Cups.  (5/7/15 Tr. at 116:24 – 117:3).  Thus, in mid-2008 he sent a letter to all of his Durom Cup patients, including Plaintiff, asking his patients to schedule an evaluation if they were having any problems.  (5/7/15 Tr. at 112:6 – 114:12).  Plaintiff responded to Dr. Shahrdar's letter by return mail dated July 5, 2008.  (5/7/15 Tr. at 19:17 – 20:8; 20:15 – 21:19; 22:11-14; Jt. Tr. Ex. 24 (7/5/08 return envelope)).

13.     On August 19, 2008, Plaintiff had a two-year check-up with Dr. Shahrdar, complaining of "severe intermittent pain" and "severe right groin pain [that] makes [it] feel that her leg wants to give out under her."  (5/7/15 Tr. at 22:15-18; 23:15-18; Jt. Tr. Ex. 34 (8/19/08 office note)).

14.     Dr. Shahrdar took and reviewed x-rays with Plaintiff, and explained to her that there was a gap between her Durom Cup and her pelvic bone, indicating that her Durom Cup was loose.  (5/7/15 Tr. at 24:22 – 25:10; 116:5-23).

15.     Dr. Shahrdar explained that Plaintiff's Durom Cup was loose because the bone had failed to grow onto the Cup the way it was intended.  (5/7/15 Tr. at 26:16-24; 58:25 – 59:7; 116:12-18).  Dr. Shahrdar also explained that Plaintiff may need to undergo surgery to remove or "revise" her Durom Cup.  (5/7/15 Tr. at 26:25 – 27:10; 59:8-9; 116:19-23).

-7-

16.     As a result of the August 19, 2008, visit to Dr. Shahrdar, Plaintiff believed that her Durom Cup was "defective," and that the pain she was experiencing was caused by the defect in her Cup.  (5/7/15 Tr. at 65:12-19).  Nevertheless, Dr. Shahrdar told Plaintiff to return in four months.  (5/7/15 Tr. at 65:20-23).

17.     On December 16, 2008, Plaintiff returned to Dr. Shahrdar complaining of continued severe right groin pain.  (5/7/15 Tr. at 27:18-21; 28:12 – 29:2; Jt. Tr. Ex. 37 (12/16/08 office note)).

18.     Dr. Shahrdar did a physical examination and took x-rays of Plaintiff's hip.  (5/7/15 Tr. at 29:1-7).  Dr. Shahrdar reviewed the x-rays with Plaintiff and explained to her that the x-rays continued to show a radiolucent line "all the way around" the Durom Cup.  (5/7/15 Tr. at 29:8-17; 59:13-19; 121:24 – 122:4).

19.     Dr. Shahrdar also spoke "at length" with Plaintiff about his belief that (a) the Durom Cup was defective, (5/7/15 Tr. at 129:24 – 130:16; 183:2-4; 184:24 – 185:4); (b) Plaintiff's pain and loosing were because of a defect in her Durom Cup, (5/7/15 Tr. at 125:19-24); and (c) for that reason, Plaintiff would need to undergo a revision of her Durom Cup.  (5/7/15 Tr. at 30:15-17; 122:8-10).

20.     At that time, Dr. Shahrdar ruled out "to a reasonable degree of medical probability" that infection was a possible cause of Plaintiff's loose Durom Cup.  (5/7/15 Tr. at 127:10-15).  In fact, Dr. Shahrdar repeatedly confirmed that revision was needed due to a defect in the Durom Cup's coating, not an infection, metallosis, or some other cause.  (5/7/15 Tr. at 31:9-15; 59:22 – 60:2; 180:13 – 181:3; 183:12 – 184:22).

21.     To the extent that Dr. Shahrdar performed diagnostic testing to rule out infection, he did so only as part of his standard procedure, and not because he believed that infection was a cause of Plaintiff's loose Durom Cup.  (5/7/15 Tr. at 123:24 – 124:10; 125:12-24).

22.     Thus, by December 2008, it was "very clear" to Plaintiff that there was a problem with her Durom Cup's coating because Zimmer did not properly test it.  (5/7/15 Tr. at 31:2-25; 39:1-6; 39:17 – 40:17).  In fact, by the fall of 2008, Plaintiff knew in her own words that "Zimmer made a change to one of the components of the appliance that was initially implanted into my body and that change had not been tested thoroughly."  (5/7/15 Tr. at 43:4 – 44:11).

23.     Thus, no later than December 16, 2008, Plaintiff *knew* (a) that her x-ray showed a radiolucent line that meant that her Durom Cup had loosened, (5/7/15 Tr. at 59:13 – 60:10); (b) that the failure of her Durom Cup had to do with the coating not being properly tested, (5/7/15 Tr. at 39:1-6, 39:17 – 40:17); and (c) had "no doubt" that she would need a revision surgery because her Durom Cup had "failed" and was "defective" as a result of the design of her Durom Cup's coating.  (5/7/15 Tr. at 32:1-20; 37:18 – 38:7; 41:2-17; 41:24 – 42:20; 60:14-17).

24.     Thus, in December 2008, Plaintiff unequivocally "knew that [she] had pain and an injury as a result of [her] Durom Cup," and, in fact, "knew that it was, in [her] mind, as a result of a defect in the coating of the Durom Cup."  (5/7/15 Tr. at 78:3-12).

25.     During the December 16, 2008, visit, Dr. Shahrdar also gave to Plaintiff the August 13, 2008, Dear Patient Letter.  (5/7/15 Tr. at 44:23 – 45:13; 60:18-20).

26.     Two days later, on December 18, 2008, Plaintiff called Zimmer to make a claim for compensation related to her Durom Cup.  (5/7/15 Tr. at 48:5-11; 50:20 – 51:5; 60:21 – 61:5).

27.     Plaintiff spoke to Doña Reust, a litigation paralegal.  During that call, Plaintiff "discussed potential settlement of [her] claim with Doña Reust" and began "settlement negotiations."  (5/7/15 Tr. at 61:2-5; 62:2-4).

28.     Ms. Reust confirmed the call via letter dated December 22, 2008.  (5/7/15 Tr. at 48:12 – 49:1; 51:6-9; Jt. Tr. Ex. 38 (12/22/08 letter)).

29.     That letter offered to Plaintiff a lump sum payment and protection from medical liens related to her revision surgery.  (5/7/15 Tr. at 79:24 – 80:1).  At that time, Plaintiff knew that she was in "settlement negotiations" with Zimmer.  (5/7/15 Tr. at 61:16 – 62:4).

30.     Although Plaintiff knew in December 2008 that she needed a revision surgery, she postponed the surgery until after her choir competition in late March 2009.  (5/7/15 Tr. at 38:8-15; 81:9-15).

31.     Plaintiff underwent revision of her Durom Cup on April 8, 2009, performed by Dr. Shahrdar.  (5/7/15 Tr. at 55:6-10; Jt. Tr. Ex. 42).

32.     To the extent Dr. Shahrdar tested for a possible infection during the revision surgery, he did so only as part of his standard procedure, and the testing only confirmed that Plaintiff had no infection.  (5/7/15 Tr. at 124:4-10; 163:2-5).

33.     On March 8, 2010, Plaintiff filed her Complaint in the United States District Court for the Eastern District of Texas.  Pl. Comp., Doc. 1.

34.     On April 23, 2015, this Court granted, in part, Zimmer's Motion for Summary Judgment.  (Doc. 706, incorporating record from April 23, 2015, hearing at 32:13 – 33:11). Thus, the only remaining claims are claims for (1) LPLA, design defect, (2) LPLA, failure to warn, and (3) redhibition.

# III.   ARGUMENT

## A.   Rule 50(a) Judgment As A Matter Of Law

A Rule 50(a) motion for judgment as a matter of law should be granted where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue."  Fed. R. Civ. P. 50(a)(1); *see also Monteiro v. City of Elizabeth*, 436 F. 3d 397, 404 (3d Cir. 2006); *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995).  Said differently, judgment as a matter of law is proper where "there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law."  *Macleary v. Hines*, 817 F.2d 1081, 1083 (3d Cir. 1987); *see also Nance v. City of Newark*, No. 97-cv-6184, 2010 WL 2667440, at *1 (D.N.J. June 25, 2010).  Thus, Rule 50 "allows the trial court to remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.'"  *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (citation omitted).

## B.   All Plaintiff's Claims Are Barred By Louisiana's One-Year Prescription Period, And Zimmer is Entitled To Judgment As A Matter Of Law

### 1.   Plaintiff does not dispute that her remaining LPLA and redhibition claims are governed by a one-year prescription period

It is undisputed that Plaintiff's LPLA and redhibition claims are governed by a one-year prescription period.  Under Louisiana law, tort claims, including those under the LPLA, are subject to a one-year prescription period.  La. Civ. Code art. § 3492 ("Delictual actions are subject to a liberative prescription period of one year."); *see Allstate Ins. Co. v. Fred's, Inc.*, 33 So. 3d 976, 981-82 (La App. 2nd Cir. 2010) ("liability as a 'manufacturer' under the LPLA is delictual").  Similarly, a claim for redhibition must be brought within one year after a plaintiff discovers the claimed defect, regardless of whether the plaintiff claims the defendant knew of the

-11-

defect or not.  *See* La. Civ. Code art. § 2534.  Accordingly, Plaintiff was obligated to file her

Complaint no later than one year after her claims accrued.

> **2.     Plaintiff's claims accrued when she had actual knowledge or was on notice ("constructive knowledge") of a potential injury or pain possibly related to her Durom Cup**

Under Louisiana law, the prescription period begins to run on the date that a plaintiff first

has actual knowledge or was on notice ("constructive knowledge") of an injury or pain possibly

related to a product.  This standard is clearly articulated in the Louisiana Civil Code and case

law.

Pursuant to the Louisiana Civil Code, the prescriptive period "commences to run from the

day injury or damage is sustained."  La. Civ. Code art. § 3492.  Likewise, Louisiana case law has

long recognized that the prescriptive period begins on the day injury or damage (*i.e.*, pain) is

sustained.  *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999) (holding that

prescription began to run when plaintiff began to feel ill, *i.e.* had pain).[2]  Thus, in the context of

medical product liability cases, "it is not necessary to receive a diagnosis of the medical problem

in order to commence the running of the prescription period.  Rather, the prescription period

begins to run at the time the injury or damage is sustained."  *Carter v. Matrixx Initiatives, Inc.*,

391 F. App'x 343 (5th Cir. 2010) (finding that prescription commenced immediately after the

plaintiff experienced "pain" and injury related to the product).[3]  Moreover, where the treating

physician advises the plaintiff of a possible connection between her injury and the product in

---

[2]     *See also Hunter v. Sisters of Charity of the Incarnate Word,* 236 So. 2d 565, 568 (La. App. 1st Cir. 1970) (prescription commenced on plaintiff's medical malpractice claim when she fell out of her hospital bed, not when a chiropractor told her that the fall caused her pain); *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 250 (La. Oct. 19, 2010) ("prescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage, ... even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act"); *Hogg v. Chevron USA, Inc.*, 45 So. 3d 991 (La. 2010) (same).

[3]     *See also Crosby v. American Med. Sys., Inc.*, No. 89-4882, 1991 WL 194724 at *2 (E.D. La. Sept. 20, 1991).

question, the plaintiff is deemed to have sufficient knowledge to begin the prescriptive period. *McNeely v. Danek Med., Inc.*, 1999 WL 1117108 at *2 (W.D. La. July 8, 1999) (holding that plaintiff "had the requisite information when plaintiff's physician informed him that his post-surgical difficulties could be related to [the medical implant].").[4]

In addition, neither actual knowledge nor "proof" of a claim is necessary to trigger the prescription period. *See, e.g., Keenan v. Donaldson Lufkin & Jenrette, Inc.*, 575 F.3d 483, 489 (5th Cir. 2009) ("Constructive notice means notice enough to call for inquiry about a claim, not from the time when the inquiry reveals facts or evidence sufficient to prove the claim.") (internal citation omitted).[5]  Thus, the commencement of prescription does not require a pronouncement of a victim's physician, expert, or lawyer.  *See Luckett*, 171 F.3d at 299-300 (citation omitted); *In re Morgan*, 727 So. 2d 536 (La. App. 4 Cir. 1998), rehearing denied, writ denied, 740 So. 2d 643 (La. 1999).  Likewise, having certainty of a potential lawsuit is not required.  *Heard v. Morehouse Parish Health Unit*, 917 So. 2d 652 (La. App. 2 Cir. 2005).[6]

In short, "the prescriptive period commences when there is enough notice to call for an inquiry about the claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." *Luckett*, 171 F.3d at 300.  Thus, when "a plaintiff has suffered some but not all of his damages, prescription runs from the date on which he first suffered actual and appreciable damage, even though he may thereafter come to a more precise realization of the

---

[4]    *See also Breaux v. Danek Med., Inc.*, 1999 WL 64929 at *5 (E.D. La. Feb. 4, 1999) (noting that plaintiff was told by his doctor over a year before suit was filed that the medical implant failed to fuse his spine).

[5]    *See also Boyd v. B.B.C. Brown Boveri, Inc.*, 656 So. 2d 683, 689 (La. App. 2d Cir. 1995), writ den., 664 So. 2d 417 (La. 1995) (stating that "knowledge, actual or constructive," rather than "proof of a cause of action ... governs the date on which prescription begins to run.").

[6]    *See also McLaughlin v. Glaxosmithkline*, 2015 U.S. App. LEXIS 3376 (5th Cir. 2015); *Crosby*, 1991 WL 194724 at *2; *Olson v. State Farm Mut. Auto. Ins. Co.*, 174 P.3d 849 (Colo. Ct. App. 2007); *Fraser v. U.S.*, 47 F. Supp. 2d 629 (D. Md. 1999).

-13-

damages he has already incurred or incur further damage as result of the complete tortious act."
*Harvey v. Dixie Graphics, Inc.,* 593 So. 2d 351, 354 (La. 1992).[7]

The U.S. Fifth Circuit decision in *Carter, supra,* is particularly instructive.  In *Carter,* the court found that prescription runs on the date the injury and pain is first associated with the product.  *See* 391 F. App'x at 345.  Specifically, on February 23, 2007, the plaintiff used "Zicam No Drip Liquid Nasal Gel Cold Remedy" and immediately experienced excruciating burning pain in her nose.  *Id.* at 344.  Within a day, the plaintiff lost her senses of smell and taste.  *Id.* Moreover, the pain was so severe that the plaintiff was unable to work and told her employer that she believed the Zicam was the cause of her pain.  *Id.*  The court found that dispositive proof of causation to support a claim was not the requisite standard for starting the prescription period, and that prescription instead started when the plaintiff had pain or injury related to the product. Specifically, the court stated:

> It is apparent that [plaintiff] first sustained the injury that allegedly resulted from her use of Zicam on February 23, 2007 and that she had actual knowledge of pain and sensory loss on that same day. From the very outset, [plaintiff] suspected and attributed her injury to Zicam, and she never wavered in that belief. That she did not possess an affirmative and conclusive medical opinion supporting this belief on that day, or even a week later when she consulted her physician, is of no moment. On February 24 at the latest, [plaintiff] indisputably had both the belief that Zicam was the cause of her injuries and a *reasonable* basis for seeking to hold the manufacturer responsible. . . .

*Id.* at 345-46 (citations omitted) (emphasis in original).

---

[7]   *See also Smith v. Cutter Biological*, 770 So. 2d 392, 401 (La. App. 4th Cir. 2000) (noting there is no requirement that the damages be "certain" or fully incurred before plaintiffs have a right of action; thus "[t]he possibility of permanent damage is enough to start the prescriptive period, even though an ultimate prognosis can only be given later") (citations omitted); *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 880 (5th Cir. 1998); *Pierce v. Am. Med. Sys., Inc.*, No. 94-2280, 1997 WL 772816 at *2 (E.D. La. Dec. 15, 1997); *Vice v. N. Telecom, Inc.*, No. 94-1235, 1996 WL 200281 at *2 (E.D. La. Apr. 23, 1996).

Furthermore, even though her doctor had suspected that the plaintiff's pain may have been related to allergies, the court found that, because the plaintiff had attributed her pain to her use of Zicam, she was on constructive notice.  In so holding, the court explained:

> It is not the rule in Louisiana, however, that the prescription period does not begin until conclusive, dispositive proof of a causal connection between the suspected injury and the putative tortfeasor is established. Rather, actual or constructive knowledge of "the tortious act, the resulting injury, and the causal connection between the two" is the benchmark for beginning the prescription period.

*Id.* at 346 (citations omitted).

In summary, when a party has suffered an injury or pain sufficient to incite curiosity, excite attention, or put a reasonably-minded person on guard and call for inquiry, that party has the constructive knowledge necessary to trigger the prescription period.  *Heller Fin. Leasing, Inc. v. Lari Imports Co.*, No. 00-cv-3729, 2002 WL 31246748, at *2 (E.D. La. Oct. 2, 2002).

### 3. Plaintiff had actual or constructive knowledge of a potential injury or pain possibly related to her Durom Cup no later than December 16, 2008

Plaintiff's unwavering and un-contradicted testimony confirms that her claims accrued no later than December 16, 2008, the date on which she had actual knowledge (or at the very least constructive knowledge) of the following:

- There was a radiolucent line "all the way around" her Durom Cup. (5/7/15 Tr. at 29:8-17; 59:13-19; 121:24 – 122:4).

- There had been a failure of her Durom Cup to adhere to the bone in her pelvis.  (*Id.* at 29:22 – 30:3).

- It was "very clear" in her mind that there was a problem with the Durom Cup's coating because, in her own words, "Zimmer made a change to one of the components of the appliance that was initially implanted into my body and that change had not been tested thoroughly."  (*Id.* at 31:2-25; 39:1-6; 39:17 – 40:17; 43:4 – 44:11).

- She had "no doubt" that she would need a revision surgery because her Durom Cup had "failed" and was "defective" as a result of the design of her Durom Cup's coating. (*Id.* at 32:1-20; 37:18 – 38:7; 41:2-17; 41:24 – 42:20; 60:14-17).

- She "knew that [she] had pain and an injury as a result of [her] Durom Cup," and "knew that it was, in [her] mind, as a result of a defect in the coating of the Durom Cup." (*Id.* at 78:3-12).

- As a result, she knew she needed a revision surgery because of a failure of the Durom Cup due to a defect associated with the product. (*Id.* at 30:15-17; 41:2-17; 59:13 – 60:17; 84:20-23).

Dr. Shahrdar's testimony reinforces Plaintiff's knowledge that her injury and pain were

possibly related to her Durom Cup:

Q:      … And  I want to be clear on this because on December 16th, 2008, you had a conversation with Mrs. Brady and you informed her, as we've said, that the cup was defective; right?

A:      Yes.

Q:      And you spoke to her at length about that; correct?

A:      Yes.

Q:      Okay.  And there was no question in your mind at that time you spoke to her at length about the fact that you thought the cup was defective?

A:      That's correct.

(5/7/15 Tr. at 129:24 – 130:9)

Q:      Okay.  And you told her in December -- on December 16th, 2008, that her pain and loosening were relative to a defect in the implant; correct?

        [Objection and ruling omitted]

A:      Yes, that's correct.

(*Id.* at 125:19-24)

Q:      And on [December 16, 2008] your record also indicates that you informed her that you recommended revision surgery; right?

A:      Yes.

(*Id*. at 122:8-10).

Thus, even though "prescription does not necessarily wait for the pronouncement of a victim's physician," *Luckett*, 171 F.3d at 300 (5th Cir. 1999), Dr. Shahrdar testified that he spoke "at length" with Plaintiff about his conviction that (a) the Durom Cup was defective, (5/7/15 Tr. at 129:24 – 130:16; 183:2-4; 184:24 – 185:4); (b) Plaintiff's pain and loosing were because of a defect in her Durom Cup, (*Id*. at 125:19-24); and (c) for that reason, Plaintiff would need to undergo a revision of her Durom Cup. (*Id*. at 30:15-17; 122:8-10).

Moreover, Plaintiff *acted* on her knowledge on December 18, 2008, by calling Zimmer to make a claim for compensation related to for her revision surgery. (*Id*. at 47:22 – 48:3; 48:14 – 49:1). Plaintiff testified at trial:

> Q:   So you understood [on December 18, 2008] that you were <u>in fact making a claim</u> with Zimmer for compensation related to your loose Durom Cup. True?
>
> A:   I believe that was the case. I believed that was the purpose of calling right away. My doctor had instructed me to call right away. I believed at that time that Zimmer would pay for the second surgery before I had the surgery.
>
> Q:   Okay. And they were going to give you compensation for the problems that you were having as a result of your Durom Cup; right?
>
> A:   Yes.

(*Id*. at 50:20 – 51:5) (emphasis added).

On December 22, 2008, Zimmer sent a letter confirming its offer to make a lump sum payment and to reimburse Plaintiff's insurance company for any medical liens related to Plaintiff's revision surgery. (*Id*. at 61:2 – 62:4; Jt. Tr. Ex. 38 (12/22/08 letter)). Thus, by December 22, 2008, Plaintiff understood that she was in "settlement negotiations" with Zimmer related to her revision surgery. (5/7/15 Tr. at 61:2-5; 61:12 – 62:4).

-17-

In summarizing the foregoing events, Plaintiff testified that by December 16, 2008, she *knew* that (a) her Durom Cup was defective, (b) that the defect was in the Cup's coating, (c) that the defect was that the coating had not been properly tested, (d) that due to the defective coating, her bone had not grown onto the backside of her Durom Cup, (e) as a result, her Cup was loose causing her injury and pain, and (f) there was "no doubt" in her mind that she would need a revision surgery because her Durom Cup "had failed because it was defective." (*See*, *supra* at 2-3); (5/7/15 Tr. at 58:10-14; 59:13 – 60:17). Plaintiff confirmed many of these facts in response to questions from her own lawyer. (*See*, *supra* at 3); (5/7/15 Tr. at 65:12-19) (testifying in response to Mr. Wolf's questions that in August 2008 she was "having problems," that she "believed that the cup was defective," and that "the cup most likely was the cause of [her] problems."). And, Dr. Shahrdar confirmed Plaintiff's testimony. (*See*, *supra* at 14). Thus, all the testimony is consistent and there is no question regarding any witnesses' credibility.

Plaintiff then confirmed that she *acted* on her knowledge by calling Zimmer on December 18, 2008, to lodge a claim, discuss compensation, and to begin "settlement negotiations" with Zimmer related to her revision surgery. (*Id*. at 60:18 – 62:4).

> Q:   Alright. And then if we go to December 18, 2008. As we discussed, you
>       called Zimmer and you discussed potential settlement of your claim with
>       Dona Reust; correct?
>
> A:   I believe so, yes.

(5/7/15 Tr. 61:2-5)

> Q:   And those are the settlement negotiations that you began with Ms. Reust
>       on December 18, 2008; right?
>
> A:   Yes.

(5/7/15 Tr. 62:2-4)

Together, these facts undisputedly establish that Plaintiff had actual knowledge (or at the very least constructive knowledge) of a potential injury or pain possibly related to her Durom Cup no later than December 16, 2009, and certainly before March 8, 2009:

> Q:    Alright.  Now, can we see the full timeline.  The last date that's on this timeline is March 8, 2009.  I put that up there just because I want us to all be clear that everything that we have on this timeline, every single thing that we have here, office visits, x-rays, letters, conversations with Dr. Shahrdar, everything that we marked on this timeline happened before March 8, 2009.  True?
>
> A:    Yes.

(*Id*. at 62:5-12).

These facts are more ironclad than *Carter* (and the other cases) discussed above.  Here, Plaintiff *knew* that her injury and pain were not only attributable to her Durom Cup, but she *knew* that her Durom Cup failed due to a very specific defect in a particular design feature of the product.  Plaintiff then *acted* on that knowledge by entering into settlement negotiations with Zimmer in December 2008.  (5/7/15 Tr. at 60:18 – 62:4).

Accordingly, no reasonable jury could find a legally sufficient evidentiary basis to find that Plaintiff's claims did not accrue by December 2008, let alone on or after March 8, 2009.

### 4.    Plaintiff filed her Complaint more than one year after her claims accrued, and Zimmer is entitled to judgment as a matter of law

Plaintiff filed her lawsuit on March 8, 2010, (*See* Pl. Comp., Doc. 1), more than one year after her claims accrued.  As explained above, Plaintiff's claims accrued no later than December 16, 2008.  Thus, Plaintiff was obligated by Louisiana's one-year prescription period to file her claims on or before December 16, 2009.  However, Plaintiff waited until March 8, 2010, to file. Accordingly, all of Plaintiff's claims are barred by Louisiana's one-year prescription period, La.

Civ. Code art. § 3492 (LPLA); La. Civ. Code art. § 2534 (redhibition), and Zimmer is entitled to judgment as a matter of law as a result. *See* Fed. R. Civ. P. 50(a)(1).

**C.      There Is No Legally Sufficient Evidentiary Basis For A Reasonable Jury To Find That Plaintiff's Claims Did Not Accrue Before March 8, 2009**

To survive Louisiana's one-year prescription period, Plaintiff bears the ultimate burden of proving that her claims did not accrue before March 8, 2009. *Aetna Cas. & Sur. Co. v. Stewart Constr. Co.*, 780 So. 2d 1253, 1257 (La. App. 5th Cir. 2001) (once a defendant makes an initial prima facie showing that prescription applies, the burden shifts to the plaintiff to prove by a preponderance of the evidence that prescription does not apply); *Crosby v. Keys*, 590 So. 2d 601, 602 (La. App. 2d Cir. 1991) (same). Plaintiff contends that her claims did not accrue until the date of her revision surgery, April 8, 2009. For the reasons explained above, however, there is no legally sufficient evidentiary basis for a reasonable jury to find that Plaintiff did not have actual knowledge (or at the very least constructive knowledge) of a potential injury or pain possibly related to her Durom Cup before March 8, 2009, let alone that she did not have such knowledge until April 8, 2009. Thus, even under Plaintiff's proposed legal standard, unsupported by current Louisiana law, Zimmer is entitled to judgment as a matter of law.

**1.      Plaintiff proposes the wrong legal standard for prescription under Louisiana law**

Plaintiff proposes that an "injury" occurs, and prescription begins to run, under the following circumstances:

> [W]hen [the injury] has manifested itself with sufficient certainty to support a cause of action. Prescription does not begin to run until the plaintiff has a reasonable basis to pursue a claim against a specific defendant. Mere notice of a wrongful act will not suffice to commence the running of the prescription period. A plaintiff is deemed to have knowledge when she knows or should have known of (1) the damage; (2) the wrongful act; (3) the connection between the damage and the wrongful act. Prescription does not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Constructive

-20-

knowledge requires more than a mere apprehension that something might be wrong.

(Pl. Prop. Inst. 2.3, Doc. 121-1, p. 6) (citations omitted).

As an initial matter, Plaintiff's proposed legal standard ignores repeated and clear precedent from the Louisiana Supreme Court and U.S. Fifth Circuit that prescription runs "from the date on which [a plaintiff] first suffer[s] actual and appreciable damage," and not when they have sufficient certainty to support a cause of action. *See Marin*, 48 So. 3d at 250; *supra* at 10-13. The cases Plaintiff relies on to support her patchwork standard, including *Knaps v. B &B Chem. Co., Inc.*, 828 F.2d 1138 (5th Cir. 1987), *Jordan v. Empl. Trans. Corp.*, 509 So. 2d 420 (La. 1987), and *McCray v. New England Ins. Co.*, 579 So. 2d 1156 (La. App. 2d Cir 1991), are not accurate examples of modern Louisiana jurisprudence and are all highly distinguishable in any event. Indeed, *Knaps*, *Jordan*, and *McCray* all involve either concealment by the defendant, contrary diagnoses by the doctors, or denial of causation by the doctors. None of these facts are present in this case.

For example, in *In Medical Review Panel for the Claim of Gochnour*, 691 So. 2d 248 (La. App. 4th Cir. 1997), the Louisiana Court of Appeals incorrectly opined – as Plaintiff does in this case – that a potential claimant must be able to state a cause of action consisting of both the wrongful act and resultant damages before the prescription period will apply. However, the Supreme Court of Louisiana reversed, reinstating the trial court's judgment applying prescription and dismissing the plaintiff's claims, thereby negating any requirement of a connection between the wrongful act and the resulting damages. 693 So. 2d 787 (La. 1997). While the Supreme Court of Louisiana issued no written opinion in the case, the Court of Appeals later recognized that the Supreme Court has made it clear in *Gochnour* and other opinions that prescription does not run when a plaintiff can state a cause of action, but when they have suffered an injury. *See*

-21-

*Neal v. Pendleton Mem'l Methodist Hosp.*, 733 So. 2d 698, 702-703 (La. App. 4th Cir. 1999), writ denied, 751 So. 2d 221 (La. 1999); *see also Marin*, 48 So. 3d at 250; *Hogg*, 45 So. 3d at 1001.

Accordingly, Plaintiff's standard should not be applied in this case. Even if it were, however, Zimmer is still entitled to judgment as a matter of law.

**2.    Even if Plaintiff's proposed legal standard were correct, there is no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff**

If Plaintiff were correct (which she is not) that prescription requires a reasonable basis to assert a cause of action against a particular defendant – *i.e.*, have enough information to file a lawsuit against Zimmer – there is still no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff. Indeed, by December 2008, Plaintiff *knew*:

(1)    the damage – continuous, severe groin pain requiring a revision surgery, (5/7/15 Tr. at 27:18-21; 28:12 – 29:2; 30:15-17; 122:8-10; Jt. Tr. Ex. 37 (12/16/08 office note));

(2)    the wrongful act – a design defect in the Durom Cup's coating, (5/7/15 Tr. at 39:1-6, 39:17 – 40:17); and,

(3)    the connection between the damage and the wrongful act – the defective coating prevented Plaintiff's bone from growing onto her Durom Cup causing it to loosen, resulting in severe pain and requiring revision. (5/7/15 Tr. at 32:1-20; 37:18 – 38:7; 41:2-17; 41:24 – 42:20; 60:14-17).

Plaintiff then *acted* on that knowledge in December 2008 to assert a claim with Zimmer:

Q:    So you understood [in December 2008] that you were <u>in fact making a claim</u> with Zimmer for compensation related to your loose Durom Cup. True?

A:    <u>I believe that was the case</u>. I believed that was the purpose of calling right away. My doctor had instructed me to call right away. I believed at that time that Zimmer would pay for the second surgery before I had the surgery.

(5/7/15 Tr. at 50:20 – 51:1) (emphasis added).

-22-

Thus, even under Plaintiff's incorrect legal standard, there is no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiff.  Said differently, in December 2008, Plaintiff had more than enough information to file a well-pled lawsuit against Zimmer, and it cannot reasonably be disputed that a jury could find otherwise.  For instance, Plaintiff endorsed the following testimony from her deposition:

> Q:     'What is your understanding of the lawsuit that you have brought that we're here about today?'  …  And your answer, ma'am, was:  'My understanding is that Zimmer made a change to one of the components of the appliance that was initially implanted into my body and that change had not been tested thoroughly.  And because of the change, that particular part failed in some patients.'  Did I read that correctly?
>
> A:     Yes.
>
> Q:     And those are your words at the very start of your deposition, page 13; right?
>
> A:     Yes.
>
> Q:     Alright.  The next question[:] 'And where did you get that understanding? Answer:  from my doctor.  Question:  Who's your doctor that you're referring to that told you this? Answer:  Cambize Shahrdar.' Did I read that correctly?
>
> A:     Yes.
>
> Q:     And a little bit further down it says:  'And <u>when did Dr. Shahrdar tell you this</u>? Answer:  I believe it was in <u>the fall of 2008</u>.'  Did I read that correctly?
>
> A:     Yes.
>
> Q:     And that was your sworn testimony at that time?
>
> A:     Correct.

(5/7/15 Tr. at 43:7 – 44:11) (emphasis added).  Plaintiff's own testimony, therefore, confirms that the information on which she bases her lawsuit was known to her in the fall

-23-

of 2008.  Accordingly, even under Plaintiff's legal standard, Defendants are entitled to judgment as a matter of law.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants are entitled to judgment as a matter of law on all of Plaintiff's remaining claims because they are time-barred by a one-year prescription period. Specifically, a reasonable jury would have no legally sufficient evidentiary basis to find that Plaintiff's claims did not accrue before March 8, 2009.  Accordingly, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, and award Defendants their costs and all other appropriate relief.

Respectfully submitted,


*/s/  Andrew L. Campbell*
J. Joseph Tanner
Adrienne Franco Busby
Andrew L. Campbell
Stephanie N. Russo
FAEGRE BAKER DANIELS LLP
300 North Meridian, Suite 2700
Indianapolis, Indiana  46202
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
joe.tanner@faegrebd.com
adrienne.busby@faegrebd.com
andrew.campbell@faegrebd.com
stephanie.russo@faegrebd.com

Edward J. Fanning
Zane C. Riester
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey  07102
Telephone:  (973) 622-4444
Facsimile:  (973) 624-7070
efanning@mccarter.com
zriester@mccarter.com

-24-

*Attorneys for the defendants,*
*Zimmer, Inc., Zimmer Holdings, Inc.,*
*Zimmer GmbH, and Wilson/Phillips*
*Holdings, Inc., a/k/a Zimmer Wilson Phillips*

-25-

## CERTIFICATE OF SERVICE

I certify that on May 11, 2015, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

J. Joseph Tanner
joe.tanner@FaegreBD.com
Stacy L. Prall
stacy.prall@Faegrebd.com
Adrienne F. Busby
adrienne.busby@FaegreBD.com
Andrew L. Campbell
andrew.campbell@FaegreBD.com
Jessica Benson Cox
Jessica.cox@FaegreBD.com
John T. Schlafer
john.schlafer@FaegreBD.com
Stephanie N. Russo
stephanie.russo@FaegreBD.com
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN  46204
317.237.0300 telephone

Regina M. Rodriguez, Esq.
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203
303-607-3738
regina.rodriguez@FaegreBD.com
*Defendants' Liaison Counsel*

ME1 20331020v.1

Edward J. Fanning, Jr.
efanning@mccarter.com
Zane C. Riester
zriester@mccarter.com
McCARTER & ENGLISH
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ  07102
973.622.4444 telephone
*Defendants' Liaison Counsel*


Wendy R. Fleishman
wfleishman@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013
212.355.9500 telephone
*Plaintiffs' Liaison Counsel*


George G. Tankard, III
gtankard@waterskraus.com
WATERS KRAUS & PAUL
315 North Charles Street
Baltimore, MD  21201
410.528.1153 telephone
*Plaintiffs' Liaison Counsel*


*s/ Andrew L. Campbell*
Andrew L. Campbell

ME1 20331020v.1